IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ASHLEY FURNITURE INDUSTRIES, INC., | |
| Plaintiff, | Case No. 2:11-cv-00427-MHW-EPD |
| vs. | Judge Watson |
| AMERICAN SIGNATURE, INC., | Magistrate Judge Preston Deavers |
| Defendant. | **REDACTED VERSION** |

**DEFENDANT AMERICAN SIGNATURE, INC.'S MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFF'S COPYRIGHT CLAIMS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant American Signature, Inc. ("Value City") moves for an Order granting it partial summary judgment and dismissing with prejudice the copyright claims in Count I of the Amended Complaint of Plaintiff Ashley Furniture Industries, Inc. ("Ashley").  The basis for this motion is set forth in the attached Memorandum in Support.

Respectfully submitted,

/s/ Marion H. Little, Jr.
Marion H. Little, Jr. (0042679)
Trial Attorney
ZEIGER, TIGGES & LITTLE LLP
41 S. High Street, Suite 3500
Columbus, OH 43215
Tel.:  (614) 365-9900
Fax:  (614) 365-7900
little@litohio.com
Counsel for Defendants
American Signature, Inc. and
Value City Furniture, Inc.

OF COUNSEL:

John W. Zeiger (0010707)
Kris Banvard  (0076216)
ZEIGER, TIGGES & LITTLE LLP
41 S. High Street, Suite 3500
Columbus, OH 43215
Tel.:  (614) 365-9900
Fax:  (614) 365-7900
zeiger@litohio.com

Theodore R. Remaklus (0061557)
Wood, Herron & Evans, L.L.P.
2700 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202
Tel.:  (513) 241-2324
Fax:  (513) 421-7269
tremaklus@whepatent.com

<u>MEMORANDUM IN SUPPORT</u>

**I.**                                          <u>INTRODUCTION</u>

> *"Copyright protection ... has never accorded the copyright owner complete control over all possible uses of his work. ... Any individual may reproduce a copyrighted work for a 'fair use;' the copyright owner does not possess the exclusive right to such a use."*
>
> [Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 432-33 (1984).]

At bottom, Value City exercised its fair-use rights and utilized fifteen photos of Ashley furniture in conjunction with an advertising campaign inviting consumers to compare the companies' respective products.  It was hardly a novel or unique concept, as explained below. However, by this litigation, Ashley has tried to convert the Copyright Act into a weapon for harassing a business competitor.  In its various papers filed with this Court, Ashley cites a litany of horribles about Value City's perfectly ordinary comparative advertising campaign – but its attacks have nothing to do with the law of copyright.

So, for purposes of addressing Value City's defense of fair use to Ashley's <u>*copyright claims*</u>,[1] let us step back briefly to consider the scope and purpose of the Copyright Act, 17 U.S.C. § 101 *et seq*.  The Copyright Clause, Article I, Section 8, of the Constitution, gives Congress the power "to Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  As the Supreme Court explains, "[t]he monopoly privileges that Congress may

---

[1]      The instant Motion is limited to Ashley's copyright claims – which were the only claims brought in the original Complaint.  A year ago to this date, Defendants filed a motion for summary judgment, asking the Court to find that alleged infringing uses of Ashley's images were a fair use as a matter of law for purposes of comparative advertising.  Ashley then sought a Rule 56(d) continuance, which was granted.  Later, after claiming it uncovered "new" information in discovery, Ashley requested and was granted leave to amend to add trademark and related claims it had abandoned in its first attempt to sue Value City (see below).  As explained in our pending Objections to the Magistrate Judge's decision, leave to amend should have been denied based on Ashley's bad faith in pursuing the amendment.  The improper amendment should be resolved by an order of this Court sustaining the Objections, and Ashley's remaining copyright claims should be disposed of by an order granting the instant Motion.

authorize are neither unlimited nor primarily designed to provide a special private benefit."
Sony Corp., 464 U.S. at 429.  Rather, the limited grant given to authors is intended to advance an important public purpose – "to motivate the creative activity of authors and inventors by the provision of a special reward … ."  Id.  The reward is that "bundle of exclusive rights" in Section 106 of the Copyright Act, including the right to publish and distribute the work for a statutory time period.  Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 546-47 (1985).  The incentive given to authors of creative works is an _economic_ incentive – the opportunity to sell the work on an exclusive basis and thereby earn money.

> _But if the work has no marketable value, the Copyright Act does not protect it_.  As quoted above, others have a privilege to make "fair use" of a copyrighted work.  Sony Corp., 464 U.S. at 433.  "[T]he single most important element of fair use" is whether the copyrighted work has marketable value – because a use that is fair "does not materially impair the marketability of the work which is copied."  Harper & Row, 471 U.S. at 566-67 (quoting Nimmer on Copyrights).  In other words, "a use that has no demonstrable effect upon the market for, or the value of, the copyrighted work" is a fair use, and it "need not be prohibited in order to protect the author's incentive to create."  Sony Corp., 464 U.S. at 450.  Dispositive of the fair use defense here is <sup>REDACT</sup>

<span style="color:red">REDACTED</span>

> In short, Ashley doesn't sell photos.  It sells furniture.  <span style="color:red">REDACTED</span>

REDACTED  No "creative expression" was impaired by Value City's use of fifteen of Ashley's photos in lawful comparative advertising.  Indeed, when we checked Ashley's copyright registrations, we found the only photographs it has ever bothered to register are the fifteen photos used by Value City.  [Exh. I (Banvard decl. ¶¶ 17-24).]  _Ashley registered them so it could file a lawsuit_.  No "creative activity of authors" will be advanced by this lawsuit.  Win or lose, Ashley will continue to produce thousands of commercial photographs in pursuit of furniture sales.

As evidenced on their face, the advertisements Ashley complains of are comparative ads in which Value City simply invited consumers to compare certain of its furniture products with products available at Ashley.  Such advertising is a fair use under 17 U.S.C. § 107 and therefore a complete defense to copyright infringement.  Accordingly, Value City is entitled to judgment as a matter of law on Ashley's copyright claims.

## II.          STATEMENT OF PROCEEDINGS

### A.          Ashley's First Lawsuit And Trademark Claims Based On Value City's Ads.

One district court judge – Judge Milton I. Shadur of the Northern District of Illinois – has already looked at Value City's ads and deemed them ordinary and non-actionable.  Our past briefs have discussed Ashley's first lawsuit, Ashley Furniture Industries, Inc. v. Value City Furniture, Inc., Case No. 10-cv-5413 (N.D. Ill.) (the "Chicago action"), so we revisit it here only briefly.  Ashley's claims under the Lanham Act, including trademark infringement and false advertising in the Chicago action, challenged the same comparative advertisements that are at issue in this lawsuit.  [See Exh. A (Remaklus decl.) (Chicago pleadings).]

Although Ashley manufactured a lawsuit based on its false notion that comparative advertising that uses competitors' names is a foreign concept that baffles consumers, Judge Shadur took judicial notice of the obvious, which is that "anyone who turns on a television set

these days is immediately confronted with commercials that not only do just that but that may also depict an example of a competitor's wares in juxtaposition to those of the advertiser."  [Exh. A (Remaklus decl. Exh. 2 (8/31/10 Memorandum Order).]

Judge Shadur found Ashley's claims "absurd," declaring "[n]o rational reader of Value City's complained-of advertising, and no observer of Value City's side-by-side pictorial depictions of the competing furniture in that advertising, would consider Value City as portraying its furniture as emanating from Ashley – precisely the opposite is the case." [Remaklus decl. Exh. 3 (9/27/10 Trial Memorandum, pp. 2-3).]  The court informed Ashley that its claims, on their face, had no merit and "indeed, they are problematic in terms of the objective good faith demand of every lawyer and client under Fed. R. Civ. P. ('Rule') 11(b)."  [9/27/10 Memorandum, p. 2.]  Later, Judge Shadur even called out Ashley for its attempt to deceive the court with arguments regarding a particular photograph used in its brief.  [Remaklus decl. Exh. 4 (transcript of 10/29/10 proceedings, at 4:18-7:2).]

Judge Shadur allowed Ashley to move for leave to amend because its original allegations were "not presented fairly."  [10/29/10 Tran. at 18:9-16; 22:1-17.]  However, at an oral argument on Ashley's motion for leave to amend, the court found its claims just as "untenable." [Remaklus decl. Exh. 6 (transcript of 12/21/10 proceedings, at 2:12-4:10).]   After the court advised Ashley it still had no claim, Ashley was allowed to voluntarily dismiss its claims.

**B.**    **Ashley's Second Action Filed In This Court; Value City's First Motion For Summary Judgment.**

Ashley then filed to obtain copyright registrations on eight furniture items identified in the Chicago action (the first time it had ever made a registration on furniture photos), relabeled its trademark claims as copyright claims, and filed a second lawsuit in this Court on May 17, 2011.  On June 8, 2011, Value City filed a Motion for Summary Judgment based on the defense

that the use of any copyrighted materials was a fair use for the purposes of comparative advertising. We explained then (as we do herein) that the lack of a market for Ashley's photos is "the single most important" factor compelling judgment for Value City on the fair use defense. Although Ashley knew its work has no marketable value, it nevertheless responded with a Rule 56(d) Motion, purporting to need discovery *from Value City* before it could oppose summary judgment. On October 4, 2011, the Magistrate Judge granted a continuance to allow discovery into fair use. On March 20, 2012, this Court denied Value City's motion without prejudice, subject to this re-filing per amended scheduling orders. In the meantime, Ashley was granted leave to amend its Complaint and, *inter alia,* plead additional copyright claims based on seven additional furniture photographs used in comparative advertisements.[2] The seven extra photos do not change the analysis. Although Ashley succeeded in dragging out this issue for twelve months, it finally is this Court's turn to examine Value City's ads and make its own judgment.

**III.**                                        **STATEMENT OF FACTS**

**A.      A Short History Of Comparative Advertising.**

Ashley alleges in paragraphs 27 and 28 of the Amended Complaint that Value City violated its copyright interest by using images of Ashley's furniture in in-store and external advertising.[3] Although Ashley has attempted to use this litigation to portray comparative

---

[2]      As we have contended in other briefs, Ashley filed copyright claims as a subterfuge. Its strategy was to secure a Rule 56(d) continuance, take some discovery, and then re-file the Lanham Act claims that were laughed out of court in the Chicago action by purporting to uncover "new" information in discovery. Value City is addressing Ashley's subterfuge via other avenues, including the pending Objections to the order granting Ashley leave to amend its complaint. This motion addresses only Ashley's copyright claims.

REDACTED

advertising as some strange phenomenon that consumers cannot comprehend, comparative advertising is as American as Coca-Cola and Pizza Hut – just to name two products that have been featured in comparative advertising over the years.

Comparative advertising dates to the beginning of the modern advertising industry itself in the early 20th century.  Some notable comparative ad campaigns in the past have included Old Gold v. Camel, Lucky Strike, and Chesterfield in the 1920s (cigarettes); Florida Oranges v. California oranges in the 1930s, Sears and Montgomery Ward v. Firestone in the 1930s (tires); and American Motors v. the Big Three in the 1950s (automobiles).  Since comparative advertising mushroomed in the 1960s and 1970s, some of the big campaigns have included Avis v. Hertz (rental cars);  Tylenol v. Bayer (headache remedies); Pepsi v. Coke (soft drinks); Burger King v. McDonald's (burgers); Budweiser v. Coors (beer); MCI v. AT&T (phone service); and Papa John's v. Pizza Hut (pizza).  See Fred Beard, Comparative Advertising Wars: An Historical Analysis of Their Causes and Consequences, J. Macromarketing, 30:270-86 (2010).[4]  This Court need only to have read a magazine, visited the Internet, or turned on a TV set from time to time to see a comparative advertisement.  If the Court has watched the Super Bowl in recent years, it could hardly miss the comparative advertising of Pepsi v. Coke, Hyundai v. BMW, etc.  A disk containing examples of TV commercials with head-to-head competition between brands is included as Exhibit 13 to the declaration of Scott Binger, which is attached as Exhibit C hereto.

---

REDACTED

---

[4]    It is appropriate for the Court to take judicial notice of statements and facts recorded in reputable academic journals such as the one cited here.  Under Rule 201(b)(2) of the Federal Rules of Evidence, a judicially noticed fact is one that is "not subject to reasonable dispute" in that they are reported by "sources whose accuracy cannot reasonably be questioned."  See, e.g., Flood v. Kuhn, 407 U.S. 258, 262 n.2 (1972) (taking judicial notice of authoritative works on history of baseball); Werk v. Parker, 231 F. 121 (3rd Cir. 1916), aff'd, 249 U.S. 130 (taking judicial notice of factual statements made in encyclopedic works available in public libraries); Hotel Employees & Restaurant Employees Union v. City of New York, 311 F.3d 534, 540 (2nd Cir. 2002) (taking judicial notice of facts contained in history of the construction of the Lincoln Center).

Examples of comparative ads appearing on the Internet are included as Exhibits 6-12 to the Binger declaration and discussed at paragraph 5 of the declaration.

As Judge Shadur readily observed, comparative advertising is ubiquitous nowadays.  And despite Ashley's attempt to pretend comparative advertising is a complex concept that consumers are unable to understand, it is not that difficult.  The Federal Trade Commission's Statement of Policy Regarding Comparative Advertising gives a simple definition:

> [C]omparative advertising is defined as advertising that compares alternative brands on objectively measurable attributes or price, and identifies the alternative brand by name, illustration or other distinctive information.

[16 C.F.R. § 14.15(b), n.1.]

Starting in the 1970s, the FTC actually undertook to encourage advertisers to make comparisons with named competitors, its objective being to benefit consumers by creating more informative advertising and, especially, encouraging price competition.  See Beard, *supra*, at 270, 278.  The FTC's policy is that: "Comparative advertising, when truthful and non-deceptive, is a source of important information to consumers and assists them in making rational purchase decisions.  Comparative advertising encourages product improvement and innovation, and can lead to lower prices in the marketplace."  16 C.F.R. § 14.15(c).

### B.    Value City Utilized Comparative Advertising To Emphasize Its Everyday Low Prices.

Value City's efforts to further educate consumers on its "everyday low prices" was the primary purpose of Value City's comparative advertising campaign.  Value City is engaged in the competitive business of selling furniture at retail to consumers from its 130 stores located in

forty-seven U.S. metropolitan markets.[5]  [Exh. B (Haffer decl. ¶ 3).]  In its experience, price is the one of the top two or three factors – if not the most important factor – that consumers consider when shopping for furniture.  [Id. ¶ 12.]

Between the spring of 2009 and the spring of 2011, Value City engaged in a comparative advertising campaign for the purpose of informing consumers of the difference in pricing between its products and similar products sold by competing furniture retailers.  [Haffer decl. ¶¶ 4, 8; Binger decl. ¶¶ 7-8.]  The theme of the campaign was designed to build on to Value City's strength as the low-price leader in the industry.  Its pricing policy is quite simple: It offers furniture products at an "everyday low price" at all of its stores.  [Haffer decl. ¶ 8.]  It posts its prices not just in stores, but on its Web sites.  [Id.]  It guarantees customers that if they find a lower price for a comparable item of furniture in another store, Value City will match that price and pay the customer double the difference.  [Id. ¶ 10.]

Value City believes that furniture-buying decisions are hampered by a marketplace that is flooded with gimmicks about prices, such as misleading "sale" offers containing asterisks and small print, and alleged discounts from "regular" prices that probably never existed.  [Haffer decl. ¶ 11.]  Indeed, Ashley's own advertising typically tells consumers that the advertised price for an item is a discount from a "compare" price for a "comparable" item at a competing retailer, but the ads never reveal who the competitor is, what the "comparable" item is, or when the "compare" price was checked.  [Binger decl. ¶ 36.]  Value City also knows from experience that consumers typically do not accept at face value a retailer's claim that it offers the best furniture deal.  [Haffer decl. ¶ 9.]  Instead, consumers often search for the best deal from a retailer by shopping around for competitors' offers on similar products.  Many consumers do this

---

[5]  The stores are owned and operated by Defendant American Signature, Inc., and do business under the name Value City Furniture in most markets and American Signature Furniture in some markets.  For ease of reference, we will use the name "Value City" to refer to the corporation and to the stores operating under either name.

comparison shopping on the Internet before they ever visit a store.  That is why Value City posts its prices on the Internet, even though it does not sell furniture online.  [Id.]

### C.    How Value City Created Its Comparative Advertisements.

Value City believes that what it does best is exemplified by its vow to give the consumer "no gimmicks, just the best prices every day."  [Haffer decl. ¶ 11.]  To share that message with consumers, Value City devised a comparative advertising campaign built around the slogan "We Shop For You."  [Haffer decl. ¶ 16; Binger decl. ¶ 9.]  The campaign was intended to communicate to customers that Value City had already done some of the legwork for them – identifying similar items at competing retailers, and identifying the relative prices – to make their job of comparison shopping a little easier.  [Binger decl. ¶ 9.]

### 1.    Value City's Campaign Focused On Its Direct Competitors.

First, to briefly state the obvious, Value City decided it would compare its furniture products with alternative major furniture brands.  The ads compared Value City products with those of a number of competitors, one of which was Ashley  [Haffer decl. ¶ 7.]  Quite simply, that is what comparative advertising does – it explicitly compares the advertised brand with a competing brand.  Value City decided that simple side-by-side comparisons of products between Value City and a competing retailer would be the simplest, most direct way to help consumers make a comparison.  [Binger decl. ¶ 8-12.]

### 2.    Value City's Ads Clearly Identified Each Retailer.

By definition, comparative advertising identifies the competing brand.  Advertising is a visual medium.  While some products can be identified visually simply by showing an image of the product – a Mercedes or can of Coke, for example – the identity of a seller of furniture is not immediately obvious from viewing the product itself.  [Binger decl. ¶¶ 10-11.]  Moreover, Value

9

City understands that consumers much more readily identify a company or brand when they see a familiar trademark or logo than if they just see a company's name in print.  [Id. ¶¶ 21-15.] Considering the options, it decided that the most distinctive way to readily identify a competing retailer was to use the retailer's trademark or logo in conjunction with showing an image of the competitor's product.  [Id.]  Thus, one style of comparative ads featured side-by-side depictions of products with the respective retailers' trademark logos – Value City's and a competitor's.  [Id. ¶ 23.]  Other types of ads – point-of-sale displays inside Value City's stores – depicted the competitor's product and logo on a sign placed next to a floor model of the Value City product consumers were invited to compare.  [Id. ¶ 22.]

### 3.    Value City's Ads Compared Similar Products.

Next, Value City knows that when comparison-shopping, consumers compare like items to like items.  Before they even walk into a furniture store, most customers have a general idea of the nature of the item they're shopping for.  For example, if customers are in the market for a sofa, they compare sofas to sofas – they don't compare sofas to lamps.  Furthermore, even within product types, customers typically compare products of similar styles, based on personal tastes and the style of the furniture they already own.  [Binger decl. ¶ 11.]

Value City's advertisements featured competing products similar to the featured Valued City product based on factors such as style and appearance, size, and, with upholstered products, type of fabric.  [Binger decl. ¶ 12; Haffer dec1. ¶ 19.]  The concept was to develop advertisements that invited a price comparison between two furniture offerings that were similar in terms of style and appearance.  [Binger decl. ¶ 12; Haffer decl. ¶¶ 4, 19.]

### 4.    Value City Utilized Ashley's Own Information In Preparing the Ads.

In addition to photos, Value City's advertisements included certain objectively verifiable information – factual information about each item, such as dimensions, type and color of fabric, and type of wood.  Value City decided to use only the information that is made available to consumers.  [Haffer decl. ¶ 29.]  Thus, as to Ashley, the information used in the ads was obtained directly from the descriptions provided to consumers on Ashley's Web sites.  [Id.]  The corresponding information on the similar Value City product was the information contained from Value City's Web sites.  [Id.]

### 5.    Value City Obtained Price Information From Visiting Ashley Stores.

As discussed above, Value City designed the campaign to emphasize price competitiveness and let consumers know it has the best price.  Value City created advertisements that published its everyday price for a furniture item alongside the everyday price for a similar item from a competitor.  With Ashley, because Ashley does not post its prices on the Internet, its prices were obtained via shoe leather – once the identity of similar items was determined, Value City store managers would visit Ashley Furniture HomeStores in the same market and document the price posted on the item on a particular day.  [Haffer decl. ¶¶ 27-28.]

On their face, the advertisements communicated to consumers that the prices were "as of" a specified date – that date being the date a store manager confirmed the price of the item at the nearest Ashley store.  The purpose was to let customers know when the price checks were made, so that customers could decide for themselves how recent the checks needed to be in order to rely on them.  [Haffer decl. ¶ 27; Binger decl. ¶ 31.]  Value City also was careful to compare apples to apples – thus it made a reasonable effort to ensure that "sale" prices were not compared to regular, or "everyday" prices.  [Haffer decl. ¶ 28.]

      **6.**    **Value City Utilized Photos That Placed Ashley's Furniture In The Best Light Possible – Ashley's Own Photographs.**

As indicated above, advertising – especially furniture advertising – is visual.  Obviously, the ads would have to depict the furniture that was being compared.  Unlike, say, decisions about headache remedies, consumers make decisions about what furniture to buy based on look and style.  [Haffer decl. ¶ 19; Binger decl. ¶ 11.]  The purpose was to make a distinction about price differences for similar products, and Value City did not intend to make its competitors look bad.  Instead, it wanted to show both its own products and competitors' products to their best advantage, and it decided against taking its own photographs of Ashley's furniture because it did not want to risk the possibility that its photos would show Ashley's products to lesser advantage than Ashley's photos do.  [Haffer decl. ¶¶ 20-22; Binger decl. ¶¶ 13-15.]

To that end, the decision was made to use digital images of Ashley products downloaded from Ashley Web sites.  Value City believed Ashley would likely consider its own photographs as the best depictions of its products.  REDACTED

R
E
D
A
C
T
E
D

### D.      The Types Of Comparative Advertisements Used By Value City.

#### 1.      Ads Displayed On Web Sites And Sent To Customers By E-mail.

Value City's comparative ads were generally of three types.  In one type, a Value City product was shown on the Value City Web site next to an Ashley product, each was identified by name, some basic information was provided, including price, and the consumer was asked to compare the products.  [Haffer decl. ¶ 14; Binger decl. ¶ 27-28.]  Two examples of this type of advertisement appear in Exhibit V to Ashley's Amended Complaint (Bates Nos. ASI 000154 and 157), one of which is shown here.



[Binger decl. ¶ 28 & Exh. 2.]  Ashley also included an example of this type of ad in its pleadings in the Chicago action; a Web site ad is attached as Exhibit 8 to the Chicago complaint.  [See Remaklus decl. Exh. 1 (complaint); Binger decl. ¶ 28 & Exh. 3.]  The ads shown to Internet users varied depending on which of the forty-seven metropolitan markets the user was located.  [Haffer decl. ¶ 14.]  In addition to being made electronically available on Web sites, these same types of ads – showing a side-by-side product comparison – were e-mailed to some Value City customers.  [Haffer decl. ¶ 14.]

### 2. **Handout Ads Used In Stores.**

A second type of comparative advertisement was a printed advertisement in which side-by-side product pairings of several competitors were compared to Value City products, under the headline "We Shop For You."  [Haffer decl. ¶ 15-16; Binger decl. ¶ 29.]  These were handed out to customers in Value City stores.  An example of a handout ad is attached as Exhibit 4 to the Binger declaration (Exh. C).  A portion of a handout ad is reproduced here:



### 3. **Point-Of-Sale Displays Used In Stores.**

In a third type of ad, an image of a competitor's product printed from a competitor's Web site was mounted in a point-of-sale display containing the headline "We Shop For You" and positioned next to a floor model of the Value City product the consumer was invited to compare.  [Haffer decl. ¶ 5; Binger decl. ¶ 30.]  A photograph showing this type of comparative advertisement that was used in test markets is reproduced below and is contained in Exhibit 12 of Ashley's proposed first amended complaint in the Chicago action.  [Remaklus decl. Exh. 5; Binger decl. ¶ 30 & Exh. 5.]  In a later iteration of this point-of-sale display, the competitor's Web-site printout was replaced with an advertisement generated by Value City showing side-by-

side images of the Value City product featured on the floor along with the similar competitor's

product.  [Haffer decl. ¶ 17; Binger decl. ¶ 30.]



**IV.**                                    <u>**ARGUMENT**</u>

**A.**     <u>**Value City's Use Of Images Of Ashley Products Was A Fair Use.**</u>

Ashley has no copyright complaint unless the challenged use infringed on the expressive

content of its protected work, and the use was not a fair use.  The Supreme Court declares:

> Copyright protection 'subsists ... in original works of
> authorship fixed in any tangible medium of expression.'  17 U.S.C.
> § 102(a).  This protection has never accorded the copyright owner
> complete control over all possible uses of his work.  …  Any
> individual may reproduce a copyrighted work for a 'fair use;' the
> copyright owner does not possess the exclusive right to such a use.
> Compare id., § 106 with id., § 107.
>
> <u>Sony Corp. of Am. v. Universal City</u>
> <u>Studios, Inc.</u>, 464 U.S. 417, 432-33 (1984).]

As discussed above in the Introduction, the limited scope of the copyright holder's

statutory rights "reflects a balance of competing claims upon the public interest: Creative work is

to be encouraged and rewarded, but private motivation must ultimately serve the cause of

promoting broad public availability of literature, music, and the other arts."  <u>Twentieth Century</u>

Music Corp. v. Aiken, 422 U.S. 151, 156 (1975).  In other words, the purpose of copyright law is to "stimulate artistic creativity for the general public good" and "[t]he sole interest of the United States and the primary object in conferring the monopoly … lie in the general benefits derived by the public from the labors of authors."  Id. (citations omitted).

Assuming *arguendo* the photographs at issue have some creative elements protected under the Copyright Act[6] and Ashley properly preserved its purported rights in the photographs, Value City has violated no rights of Ashley because its use is protected by the fair use defense. Fair use has been defined as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner [by the copyright]."  Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 306 (2nd Cir. 1966).  The purpose of fair use doctrine is "to promote certain productive uses of existing copyrighted material."  Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1254 (2nd Cir. 1986).

In Section 107 of the Copyright Act, Congress expressly permitted a non-holder's use of copyrighted works, "including … by reproduction," when the use is deemed as "fair" according to a non-exhaustive list of factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> [Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 533, 537 (6th Cir. 2004).]

---

[6]   Ashley's furniture photographs are objective, representational images of the subject furniture items.  They barely reach the borderline of "expressive"; they certainly do not "display the stamp of the author's originality" necessary to bring them within the ambit of the Copyright Act.  Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 547 (1985).

Thus, "[a] person who makes fair use of a copyrighted work is not an infringer even if such use is otherwise inconsistent with the exclusive rights of the copyright owner." A.V. v. iParadigms, LLC, 562 F.3d 630, 637 (4th Cir. 2009).[7]

Before considering the individual fair use factors, it is important to dispel a big myth advanced by Ashley in previous briefs:  Ashley persistently tries to confuse and conflate copyright law with trademark law, injecting trademark issues into its briefing on its copyright claims in this case.  The leading treatise on trademark law explains the key differences between the two:

> Copyright law gives the author the right to prevent copying of the copyrighted work in any medium.  Trademark law prevents the use of a similar mark on such goods or services as would probably cause confusion.  Thus, the scope of rights in copyrights and trademarks is defined quite differently.
>
> [McCarthy on Trademarks & Unfair Competition § 6.14, p. 6-34 (2012).]

In the area of copyright, the leading treatise in that field explains that the crucial difference between copyright claims and trademark or deceptive trade practices claims "is the element of misrepresentation or deception, which is no part of a cause of action for copyright infringement." 1 Nimmer on Copyrights § 1.01[B][1][e], p. 1-35 (2011).  The Supreme Court warned against blurring the boundaries between copyright and trademark law in Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003).  See also McCarthy § 6.14, p. 6-36.  In Dastar, a party argued for an interpretation of the Lanham Act that would have created a cause of action for "misrepresentation of authorship of noncopyrighted works." 539 U.S. at 35.  The

---

[7]     We note that Ashley alleges at paragraph 27 of the Amended Complaint that Value City did not ask permission to use the photographs, but that is irrelevant to this inquiry.  "If the use is otherwise fair, then no permission need be sought or granted.  Thus, being denied permission to use a work does not weigh against a finding of fair use." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 585 n. 18 (1994).

Court reasoned this would improperly stretch trademark and false advertising law into copyright law to create a "species of mutant copyright law" that would prohibit under the Lanham Act the use of a creative work that copyright law allows.  See id.  Thus, while Ashley used copyright claims as a stalking horse for its trademark claims in this case, the Court should reject its attempt to confuse these two distinctive areas of law.

With these caveats in mind, we turn to the four fair-use factors.

### 1. First Fair Use Factor: The Purpose And Character Of Value City's Use Is A Proper Use For Purposes Of Comparative Advertising.

The focus of the first factor is to what extent an alleged infringer's use is "transformative."  A new work is _transformative_ if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994).

Value City's use of Ashley's images was transformative because it did not use the image for the same purpose as Ashley.  The key point is: _Ashley used the images to sell Ashley furniture, but Value City used them to sell Value City furniture._  [Haffer decl. ¶ 23; Binger decl. ¶ 18.]  The images were used in comparative ads to depict Ashley products and to contrast those products with Value City products, thereby enabling consumers to compare the products.  See, e.g., 4 Nimmer on Copyrights § 13.05[B][4], p. 13-218 (2009) (referring to comparative advertising as "[a]nother example of a different functional use justifying the defense of fair use").  Indeed, because the photographs used by Value City are the same photographs Ashley used to depict its own furniture, the photos serve this purpose more credibly than any photos Value City might have commissioned on its own.  See, e.g., Sony Computer Entertainment Am., Inc. v. Bleem, LLC, 214 F.3d 1022, 1027 (9th Cir. 2000) (addressing comparative ads using screen shots from Sony PlayStation: "Sony argues that Bleem can advertise without the screen

shots, which is certainly true, but no other way will allow for the clearest consumer decisionmaking").

Although commercial use is a consideration in the fair-use analysis, for that consideration to weigh "heavily against a finding of fair use, it must involve more than simply publication in a profit-making venture." Nunez v. Caribbean Int'l News Corp., 235 F.3d 18, 22 (1st Cir. 2000). Even if the exact and entire image is used, where the use is transformative – i.e., it serves a different function than that of the copyright owner – courts should "consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially." Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510, 1523 (9th Cir. 1992).

For example, in Kelly v. Arriba Soft Corp., 336 F.3d 811, 819 (9th Cir. 2003), Arriba used images of the plaintiff's artistic works in connection with an Internet search engine, but the court found that because the use of the images was for a different purpose – "improving access to information on the internet versus artistic expressions," and provided the public benefit of a public search engine – the use was transformative and, thus, weighed in favor of finding a fair use. Similarly, as the same court explained in a later decision regarding an Internet search engine, the fact that Google incorporated entire copyrighted images in its search engine did not alter the transformative nature of the use, because "*even making an exact copy of a work may be transformative so long as the copy serves a different function than the original work*." Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1165 (9th Cir. 2007) (emphasis added). The court found that the "significantly transformative nature of Google's search engine, particularly in light of its public benefit, outweigh[ed] Google's superseding and commercial use" of the images, and that the first factor weighed heavily in favor of fair use. Id. at 1166-67.

The same is true here.  Although Value City's use of the images of Ashley products was for commercial purposes, that fact is neither controlling nor does it create any presumption against fair use.  To the contrary, two leading decisions found that the use of copyrighted images of a competitor in comparative advertising is both beneficial to the public and a fair use.

In Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171, 1172 (5th Cir. 1980), Knight-Ridder, a competitor of TV Guide, used copies of covers of TV Guide magazines in advertisements run in its Miami Herald newspaper to promote its own TV supplement by comparing it with TV Guide.  On appeal, the Fifth Circuit found that, although the use was a commercial one, the use for comparative advertising made it a fair use:

> [T]he precise characteristics of the commercial use in this case caution against too much weight being given to the fact that the use is commercial. Specifically, there was no attempt to palm off Triangle's product as that of the Herald's. Rather, the advertisement was a comparative advertisement done in a manner which is generally accepted in the advertising industry.

[Id. at 1176.]

The court added that while the Miami Herald "is clearly out to make a profit from its advertisements," the advertisements obviously made no attempt to palm off Triangle's copyrighted work as the Miami Herald's work; "[r]ather, the Herald has used various covers of TV Guide for purposes of comparative advertisements." Id. at 1176, n.13.

Similarly, in Sony Computer Entertainment Am. v. Bleem, LLC, cited above, the defendant used screenshots from Sony games to provide a comparison between what the games looked like on a Sony PlayStation and using a game "emulator" from Bleem, which the Ninth Circuit concluded constituted comparative advertising.  See 214 F.3d at 1027.  Citing Triangle Publications for the proposition that the public benefits from comparative advertising as a means of providing more information to the public, the court went on to find that although Bleem could

20

advertise without using Sony's images – as Ashley argues Value City could have done in this case – Bleem's advertising in this fashion served the public good because it "will almost certainly lead to product improvements as Sony responds to this competitive threat and as other emulator producers strive for even better performance."  214 F.3d at 1027.  The court held that the first fair-use factor, "considered in light of the animating principles of the copyright regime," weighed in favor of the use as a fair use.  "Although Bleem is most certainly copying Sony's copyrighted material for the commercial purposes of increasing its own sales, such comparative advertising redounds greatly to the purchasing public's benefit with very little corresponding loss to the integrity of Sony's copyrighted material." Id.

Likewise, here the consumer benefit of encouraging price competition outweighs any impairment to Ashley's photographs.  Indeed, the fact that Ashley's photos have _no marketable value_ (see fourth factor below) also supports the transformative nature of Value City's use.  As the Supreme Court explained on the first fair use factor, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471 U.S. at 562.  Here, the "customary price" is zero.  Value City did not "profit" by not paying royalties to use a work that is not sold and has no market value.

In sum, the transformative nature of Value City's use of Ashley's images, particularly in light of the public benefit of the comparative advertising in which they were used, outweighs any commercial aspect of that use, and the first factor weighs strongly in favor of Value City.

### 2. Second Fair Use Factor: Any "Creative" Aspect Of Ashley's Work Is Minor And Given Little Weight Where The Use Is Transformative.

The second factor, the nature of the copyrighted work, focuses on whether the work is creative or fact-based, and whether the work had already been published at the time of the use.

In this case, the photographs that Ashley registered with the Copyright Office are commercial advertising materials intended simply to be representational images of the products depicted. [Binger decl. ¶ 16.]  As such, they are more akin to fact-based works, which do not enjoy copyright protection.  Moreover, Ashley published the images on its Web site.  See, e.g., Kelly v. Arriba Soft Corp., 336 F.3d at 820 ("Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred.").

As one court noted in a case involving the use of images of skin-care products:

> The work product of a graphic designer … is fundamentally creative in nature.  With that said, the renderings were not created for any aesthetic or educational purpose but for the functional purpose of selling products.  Thus, although creative, the renderings do not seem to be at the core of intended copyright protection.  Moreover, the fair use doctrine is more likely to apply to published works, and Designer Skin concededly published its renderings on the internet before S & L Vitamins allegedly copied them.  Nevertheless, because of the clearly creative nature of the work, this factor weighs slightly against fair use.
>
> [Designer Skin, LLC v. S & L Vitamins, Inc., 560 F. Supp. 2d 811, 824 (D. Ariz. 2008) (citations omitted).]

Although the court in Designer Skin found this factor weighed slightly against fair use, that case involved the use of the images by the defendant to sell *the plaintiff's* products, *i.e.*, they were used for the same purpose as the plaintiff.  Where, as here, the defendant's use is transformative, courts have found this factor is entitled to less weight.  See, e.g., Bill Graham Archives, 448 F.3d at 612 (giving factor less weight because the images of rock-concert advertisements were used for the "transformative purpose of enhancing the biographical information" in defendant's book about the Grateful Dead).

Still further, the court in Sony Computer noted that "[t]he Supreme Court has passed over this factor without giving it much attention, stating that it is often 'not much help,' " and

concluded this factor neither helped nor hurt the defendant's claim of fair use.  <u>Sony</u>, 214 F.3d at 1028 (quoting <u>Campbell</u>, 510 U.S. at 586).  Accordingly, even when viewed in a light most favorable to Ashley, this factor weighs in favor of a conclusion of fair use.

### 3.   Third Fair Use Factor: Use Of The Furniture Images In Their Entirety Was Reasonable And Therefore A Fair Use.

Under the third factor, a court considers the amount of the portion used in relation to the copyrighted work as a whole.  Here, Ashley's images were used in their entirety, but this does not necessarily weigh against fair use because using the entirety of a work is sometimes necessary to make a fair use of the image.[8]

Here, it was necessary to copy images in their entirety because the images were used to identify Ashley's products and to enable customers to compare those products with Value City's products.  Had Value City used less than the full images, it would not have been able to fairly present the Ashley products and consumers would have been less able to compare them.  Ashley has argued that Value City should not have used images in their entirety and should have considered "a more limited use" of them.  [<u>See</u>, <u>e.g.</u>, Rule 56(d) Motion, filed 7/8/11, p. 12 & Exh. A (Burke decl. ¶ 7(i)).]  But its implied contention – that "a more limited use," or using partial images, would have been just as effective and not objectionable to Ashley – has no merit.  So long as a defendant's explanation for copying a work in its entirety is reasonable, a court will not split hairs over whether "myriad possible" alternative methods of using the work could also have served the purpose of the use.  <u>Belmore v. City Pages, Inc.</u>, 880 F. Supp. 673, 679 (D.

---

[8]     <u>See</u> <u>Campbell</u>, 510 U.S. at 586-87 (third factor must take into account that the "the extent of permissible copying varies with the purpose and character of the use"); <u>Kelly</u>, 336 F.3d at 821 (concluding that images used for a search-engine database are necessarily copied in their entirety for the purpose of recognition); <u>Nunez</u>, 235 F.3d at 24 (concluding that to copy any less than the entire image would have made the picture useless to the story).

Minn. 1995) (summary judgment to defendant, finding its use of a textual work in its entirety was a fair use).  As with the above two factors, the third factor also weighs in favor of fair use.

> **4.    The Fourth Fair Use Factor: Value City's Use Had No Effect On The Market For Ashley's Work Because There Is No Market.**

On the fourth factor – the effect of the use upon the potential market for or value of the copyrighted work – REDACTED

REDACTED

R
E
D
A
C
T
E
D

For months, Ashley managed to avoid producing discovery in response to requests for information on the fourth fair use factor.  [Exh. I (Banvard decl. ¶¶ 2-13).]  The fact that there is no market for its furniture photos REDACTED                is underscored by the fact that

*the only* copyright registrations it has ever filed for a photograph of a furniture product are the fifteen images at issue in this case.  [Id. ¶¶ 17-24.)]  Ashley didn't bother filing for a copyright on the other tens of thousands of images it has because the images have no market value.  But Congress did not enact copyright protection so litigants could fabricate lawsuits.

Thus, the Supreme Court declares that the fourth fair use factor – existence of a market for the copyrighted work – "is undoubtedly the single most important element of fair use" because a use that is fair "does not materially impact the marketability of the work which is copied."  Harper & Row, 471 U.S. at 566-67; see also Sony Corp. of Am., 464 U.S. 417, 450 ("[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create.").  Accord: Belmore, 880 F. Supp. at 679 (summary judgment merited on fourth factor where plaintiff "provided no evidence that he has sold, or ever attempted to sell" the copyrighted work); Sofa Entertainment, Inc. v. Dodger Productions, Inc., 782 F. Supp. 2d 898, 910 (C.D. Cal. 2010) (granting summary judgment to defendant given plaintiff's failure to present evidence that it licenses or plans to license the subject work).

Ashley sells furniture, not photographs.  Thus, the only "market" relevant to the fourth fair use factor is the nonexistent market for Ashley's copyrighted works – *not* the market for the underlying product, Ashley's furniture.  As the Sixth Circuit has explained, the relevant market is the one for the copyrighted work, not a product related to that work.  See Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 533, 545 (6th Cir. 2004).  Accordingly, this final and most important factor weighs completely in favor of Value City.

To summarize, taking into consideration all four factors, even if we assume protected aspects of Ashley's images were copied, Value City's use is a fair use under 17 U.S.C. § 107, and Value City is entitled to judgment as a matter of law on the Ashley's copyright claims.

### B. Ashley Is Foreclosed As A Matter Of Law From Claiming Willful Infringement And Seeking Statutory Damages And Attorneys' Fees.

We note that Ashley's Amended Complaint dropped the allegation contained in the original Complaint that Value City's activities were "willful" pursuant to 17 U.S.C. § 504(c)(2), although its prayer for relief includes a demand for attorneys' fees.  Nevertheless, to the extent Ashley continues to purport otherwise, it is barred as a matter of law from pursuing a claim for statutory damages under Section 504(c)(1) or for attorneys' fees based on purported willful infringement under Section 504(c)(2).

A statutory prerequisite for any of the above relief is that Ashley must have registered the allegedly infringed works _before_ the alleged infringement began.  See 17 U.S.C. § 412.  Ashley failed to do so.[9]  Because Value City's use of each of the copyrighted works commenced _before_ the effective date of the registration of each work and after its publication, Ashley may not seek statutory damages or attorneys' fees.  See Johnson v. Jones, 149 F.3d 494, 504-05 (6th Cir. 1998) (holding 17 U.S.C. § 412(1) "leaves no room for discretion, mandating that no attorney's fees or

---

[9]    The initial eight copyright registrations Ashley sued on have effective registration dates _after_ the date Ashley first included in a pleading in the Chicago action a Value City comparative ad having an image that is alleged to be a subject of those copyright registrations.  Specifically, the copyright registration certificates attached as Exhibits A-G to the original Complaint in this case have registration dates of September 23, 2010, yet the complaint filed in the Chicago action on August 26, 2010, included Value City's comparative ads having images of those same furniture items.  [Remaklus decl. Exh. 1 (Chicago action Compl. ¶ 28 & Exh. 8 thereto).]  Similarly, the copyright registration certificate attached as Exhibit H to the original Complaint in this case for the "Marion Coffee Table" has an effective date of February 4, 2011, but it appeared in the proposed first amended complaint filed in the Chicago Action on November 30, 2010 [Remaklus decl. Exh. 5 (proposed first amended complaint at Exh. 14 thereto).]  Also, the certificates on their face make clear that each of the works was published more than three months before the registration's effective date.  [See original Compl. Exhs. A-H.]  Similarly, the seven additional copyright registrations attached as Exhibits I-O to the Amended Complaint have an effective registration date of December 8, 2011, but list dates of first publication of between 2001 and 2009.  Ashley admits that Value City used those images before the effective registration dates.  [See Motion for Leave to Amend, filed 1/4/12, at 4-5 (stating registrations were obtained after advertisements using these images were produced in discovery).]

26

statutory damages be awarded so long as the infringement commenced before registration of the copyright"). Accordingly, Value City is entitled to summary judgment on such theories.

**V.**  <u>**CONCLUSION**</u>

For all the foregoing reasons, summary judgment should be granted and Plaintiff's copyright claims dismissed with prejudice. The Court should then sustain the Objections to the order giving Ashley leave to amend and dismiss Ashley's claims in their entirety.

Respectfully submitted,

/s/ Marion H. Little, Jr.
Marion H. Little, Jr. (0042679)
Trial Attorney
ZEIGER, TIGGES & LITTLE LLP
41 S. High Street, Suite 3500
Columbus, OH 43215
Tel.: (614) 365-9900
Fax: (614) 365-7900
little@litohio.com
Counsel for Defendants
American Signature, Inc. and
Value City Furniture, Inc.

OF COUNSEL:

John W. Zeiger (0010707)
Kris Banvard  (0076216)
ZEIGER, TIGGES & LITTLE LLP
41 S. High Street, Suite 3500
Columbus, OH 43215
Tel.: (614) 365-9900
Fax: (614) 365-7900
zeiger@litohio.com

Theodore R. Remaklus (0061557)
Wood, Herron & Evans, L.L.P.
2700 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202
Tel.: (513) 241-2324
Fax: (513) 421-7269
tremaklus@whepatent.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 8, 2012, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.  Additionally, an unredacted copy of the foregoing has been served, via hand delivery, on June 8, 2012, upon the following:

> Michael H. Carpenter, Esq.
> Katheryn M. Lloyd
> CARPENTER LIPPS & LELAND LLP
> 280 Plaza, Suite 1300
> 280 North High Street
> Columbus, OH 43215
>
> Attorneys for Plaintiff
> Ashley Furniture Industries, Inc

/s/ Marion H. Little, Jr.
Marion H. Little, Jr. (0042679)

885-005:367986