IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ASHLEY FURNITURE INDUSTRIES, INC., | |
| Plaintiff, | Case No. 2:11-cv-00427-MHW-EPD |
| vs. | Judge Watson |
| AMERICAN SIGNATURE, INC., | Magistrate Judge Preston Deavers |
| Defendant. | |

### DECLARATION OF SCOTT BINGER

I, Scott Binger, hereby declare:

1. I am Vice President of Creative Services and Customer Experience for American Signature, Inc. ("American Signature"), Defendant in the above-captioned action filed by Plaintiff Ashley Furniture Industries, Inc. ("Ashley"). I have held that position for approximately two years, and before that I was Vice President of Visual Merchandising for American Signature.

2. I have more than thirty years of experience in visual merchandising, store design, and marketing creative services, specializing within the home furnishing retail sector. Previous to American Signature, I was with The Bombay Company in Forth Worth, Texas, for thirteen years, serving as vice president of creative services for that nationally known furniture retailer. Additional experience includes visual management with several Midwestern department store chains

3. American Signature is in the business of retailing furniture to the public through its 130 stores located in forty-seven U.S. metropolitan markets. The majority of the company's

**EXHIBIT C**

stores do business under the name Value City Furniture, while the other stores operate under the name American Signature Furniture.

4. I was involved in the comparative advertising campaign conducted by American Signature that is at issue in the litigation filed by Ashley. The marketing department creative team that I supervise created the advertisements at issue.

5. Comparative advertising is very common. For example, the following exhibits to this declaration contain copies of comparative advertisements that were found on the Internet in December 2011:

> (a) Exhibit 6 contains an example of a consumer do-it-yourself product comparison offered by Nissan. On this Web site, Internet users can choose between a menu of car models and compare specifications and features between a Nissan model of their choice with another manufacturer's vehicle of their choice. In the example printed, a Nissan 370Z sports car is compared with a Mazda MX-5 Miata. The two vehicles are identified by the use of photographs.
>
> (b) Exhibits 7 and 8 contain comparative advertisements offered by Chevrolet that are similar to the format to the Nissan ad. In these advertisements, a Chevy Impala is compared with similar vehicles offered by other manufacturers on several features, including price. Each vehicle is identified using photographs.
>
> (c) Exhibit 9 contains a comparative advertisement by Tempurpedic beds comparing its brand with the Sleep Number brand of bed. Similar to some of the comparative advertisements at issue in the litigation brought by

2

Ashley, the headline on the ad is "Sleep Number vs. Tempurpedic," and trademark logos are used to identify both companies. This particular ad contains a large block of text explaining the features of and differences between the products.

(d) Exhibit 10 contains a comparative advertisement published by a company called WowWe, which offers video conferencing services. The ad contains a checklist-style graphic that identifies competing conferencing services by use of their trademark logos. This graphic allows the reader to quickly scan a list of features offered or not offered by each company, with the monthly price charged by each company at the top. WowWe makes a selling point of its price, which is significantly lower than the other companies it compares itself with.

(e) Exhibit 11 contains an advertisement for a brand called Dr. Tim's Exotic Juices. Each of several different juice flavors is compared with two competing brands offering the same or similar flavor. Basic factual information is presented for each of the three comparison products. The reader quickly sees that Dr. Tim's selling point is that it costs less, as its prices are highlighted in red type, whereas the competitors' higher prices are shown in black type.

(f) Exhibit 12 is not an advertisement itself but, rather, a blog about advertising, and this particular entry is about comparative advertising. Indeed, blogs and commentary about comparative advertising can be found all over the Internet, which suggests that people seem to be

fascinated by advertising and competition between branded products. The blog entry contained in Exhibit 12 reproduces and comments on two comparative ads produced by Mini Cooper that that compared its cars with Porsche on the aspects of speed and price – and the purpose of the ads is to urge auto buyers to consider the Mini because it's cheaper. The thrust of the ads is that Mini set up a series of short timed heats between itself and Porsche. The twist is that Mini reported that the Porsche came in faster, although only slightly (about 2 seconds for each 1-minute lap), but the Porsche costs $60,000 more. "That's more than $30,000 a second," one ad states.

6. Comparative advertising is also easily found on television. Exhibit 13 to this declaration contains a DVD that captures a number of comparative advertisements.

(a) A Ford commercial that ran as part of a well-known comparative ad campaign in the late 1970s humorously compares the Ford Granada to a Mercedes-Benz, based on the fact that the two cars were somewhat similar in appearance. The message boils down to: Instead of paying $20,000 for a Mercedes, why not buy a $5,000 Ford that looks like a Mercedes?

(b) An Advil commercial in which the "real-person" actor claims Advil gives her better headache relief than Tylenol. The viewer is shown close-ups of three forms of Tylenol pills or capsules juxtaposed with an Advil pill.

(c) A commercial for Aleve in which a "real person" actor holds up a box of Aleve next to a box of Tylenol and recites product claims that Aleve is superior.

4

(d) A humorous Audi commercial that shows a driver abandoning his BMW while he's driving on the freeway to climb onto one of the Audis passing by in a dealer's transport truck in the lane next to him. A serious-sounding announcer intones that "more people are leaving BMW, Lexus, and Mercedes for Audi than ever before."

(e) A humorous Domino's commercial claiming that its oven-baked sandwiches beat Subway in a national taste test "two to one." A Domino's spokesman makes fun of a supposed cease-and-desist letter sent by Subway's lawyers by sticking it into an oven.

(f) Two Hyundai commercials that are part of its long-running comparative advertising campaign featuring the luxury Hyundai Genesis, which is touted as much less expensive than BMW, Mercedes, or Lexus and giving those other companies fits. One of the ads features trademark logos of the three competitors.

(g) A commercial from the well-known Mac vs. PC comparative ad campaign.

(h) Two Powerade commercials that show a bottle of that brand of sports drink literally knocking bottles of competing sports drinks Propel and Gatorade out of the TV picture.

(i) A Pepsi vs. Coke commercial that juxtaposes Pepsi cans and Coke's trademarked bottles.

(j) A Time Warner Cable commercial touting a new feature that it announces Verizon doesn't have.

(k)     A Kia commercial claiming the Kia Optima has features similar to BMW, Honda, and Nissan models but is priced at thousands of dollars less than those competing makes.

7.     The comparative advertising campaign that is at issue in the litigation brought by Ashley began in the spring of 2009 as a test project in four markets – Columbus (which included some other stores in Ohio), Atlanta, Philadelphia, and Chicago. Later, the campaign was expanded to include all stores in all forty-seven markets. The campaign ended in the spring of 2011.

8.     The purpose of this ad campaign was to invite customer to compare certain products offered by American Signature to similar products offered by a number of competing major retailers in each market – including Ashley in the markets where American Signature competes with Ashley.

9.     A key slogan used in the ad campaign was "We Shop For You." This was intended to communicate to customers that we had already done some of the legwork for them – identifying similar items at competing retailers, and identifying the relative prices – to make their job of comparison shopping a little easier.

10.     Furniture is marketed based on its look. A furniture advertisement must visually present the product, because customers expect to see what an item looks like before they will even think about whether to buy it. Therefore, a key aspect of the comparative ad campaign was that the ads needed to show images of our product and the competitor's similar product upfront – or in the case of a floor display inside one of our stores, the image of a competitor's product next to a floor model of our product.

11. American Signature knows that the visual appearance of a furniture product is just as important for purposes of comparison-shopping, and it knows that consumers like items to like items. For example, a customer who is looking for a living-room sofa will compare sofas with sofas, not sofas with lamps. American Signature also knows that customers target their furniture shopping based on personal taste and the other furniture they have in their homes. A customer who has a house full of Danish modern furniture, for example, will not comparison-shop by looking for traditional-style sofas with rivets and rolled arms.

12. In our comparative ad campaign, we developed advertisements featuring side-by-side comparisons of similar products available from our stores and from a number of competing retailers, including Ashley. The subjects of the side-by-side advertisements were chosen primarily based on similarities in style and appearance, size, and, with upholstered products, type of fabric.

13. In the case of comparative ads featuring Ashley, we made the decision to download and use images from Ashley's Web sites for purposes of depicting Ashley's products. Ashley's images were used because we wanted to show both items – ours and theirs – in the best light possible, and we presumed that Ashley would make the effort to produce the best images of its own furniture.

14. In total, Ashley's images of fifteen of its furniture products were used in our comparative ads. Furniture images that were used are included in Exhibit 1 attached to this exhibit, which is a compilation of Ashley's deposition exhibits 15, 16, and 17.

15. We elected not to shoot our own photographs of Ashley's furniture because our strategy was to present the product in the way that Ashley itself would present the product. If we had shot our own photographs, there could be doubt as to whether the images met Ashley's

standards. Someone could make an inference that we attempted to show Ashley's product in a less flattering light – which was the opposite of our intent.

16. While Ashley's furniture images are examples of good commercial photography, they are clearly objective, representational works that were made for the sole purpose of showing what the product looks like. There is no particular artistic expression to the photos and certainly no indication of individualized technique. To the contrary, Ashley's photographs are very uniform in appearance even though it produces a vast number of photographs for promotional purposes.

17. We used Ashley's images also because we wanted to make it easy for consumers to use one of our ads to seek information from Ashley itself, such as from an Ashley Web site. By having with the exact same photo Ashley uses to identify its product, consumers could match photographs and make no mistake that the product featured in our advertisement is the Ashley product.

18. Ashley uses its furniture images to sell Ashley furniture products, as is seen from their use on Ashley's Web sites to promote sales at Ashley stores. American Signature used Ashley's images, however, for the sole purpose of selling American Signature's furniture. American Signature does not sell Ashley Furniture.

19. In copying Ashley's photos from its Web pages, to my knowledge we did not notice any copyright symbols or legends displayed in conjunction with the actual images. We also did not see any warnings or notices indicating that Internet users were prohibited from copying the photographs.

20. We used the Ashley images unaltered and in their entirety, just as the images of American Signature's pieces were shown in their entirety. The advertisements were intended to

show price transparency on like products, so there was no question that the images had to be the same as Ashley presented them. If we had doctored the images or shown only partial images of Ashley's products, it would appear as if we were trying to conceal something, and consumers would naturally wonder what was left out.

21. Another consideration we had was that the comparative ads needed to distinctly identify the competing retailers and distinguish competitors' products from our products. As to competitors' products, we decided to use trademark logos to identify the competitors' products and, where necessary, our products. Trademark logos were used for identification purposes as to all competitors, not just Ashley.

22. In the case of point-of-sale floor displays, identifying our product was a matter of context. Customers would know they were inside a Value City or American Signature store looking at a physical sample of the our product sitting right in front of them. "Value City" or "American Signature" appears in giant letters on the front of all of our stores, and once a customer is in our store, there's no mistaking it for another store. Thus, we developed point-of-sale ads that were designed to be placed next to our product on the floor and to depict the competing product and identify the competitor and its product by use of the competitor's trademark logo.

23. For our side-by-side photographic advertisements, some were used in handouts, which customers could take with them and others were used on the Internet. Thus, these ads would not always appear in conjunction with our physical product, so we used trademark logos to identify both our product and the competing product. This use was similar to that in a typical Pepsi vs. Coke commercial, such as the one reproduced on the disk contained in Exhibit 13, which shows cans of Pepsi in juxtaposition with bottles of Coke that display Coke's trademark

9

(and its presumably copyrighted bottle shape and label design) – as opposed to merely stating that the other product is Coke or showing Coke's name in a generic typeface.

24. As to Ashley, our comparative advertisements initially used a stylized "Ashley" logo that Ashley itself uses to identify its product. During the campaign, we switched to using the "Ashley Furniture HomeStores" mark because Ashley began heavily advertising that mark. Because of the exposure being given to it in the marketplace we believed that logo would be a stronger identifier for Ashley's furniture products in our advertisements.

25. In each advertisement, our own products were identified by our Value City or American Signature trademark logo, depending on the market where the ad was used. In addition, some of the comparative ads further used wording or slogans that helped identify the respective products, such as labeling the respective products on our Web advertisements as "OURS" and "THEIRS."

26. In the ad campaign at issue, comparative advertisements were developed in both printed and electronic form.

27. Electronic ads were developed for display on our company Web sites, www.vcf.com and www.asfurniture.com. In each market, depending on the Internet address of the computer user, a selection of ads would appear on computer screens screen in a rotating display featuring selected products that were available in that market. The individual ads featured a side-by-side comparison between an American Signature product and a similar product from a competitor, including Ashley in markets where Ashley was a competitor. An image of each product was shown, with basic information, including price. Electronic ads were sent to American Signature customers by e-mail. These ads also showed side-by-side product comparisons, with one comparison per e-mail (not a rotating display).

28. True and accurate copies of two examples of the Web ads were attached as Exhibit V to Ashley's Amended Complaint in this litigation (Bates Nos. ASI 000154 and 157), a copy of which is attached as Exhibit 2 to this declaration. Ashley also included an example of this type of ad as Exhibit 8 to the Complaint in its first lawsuit pertaining to the comparative ad campaign, which it filed in the United States District Court for the Northern District of Illinois (Ashley Furniture Industries, Inc. v. Value City Furniture, Inc., Case No. 10-cv-5413 (N.D. Ill.)). That particular exhibit contains screenshots that demonstrate how the ads would have appeared to computer users when they accessed www.vcf.com during the time the ad campaign was running. A copy of Ashley's Exhibit 8 to that pleading is attached here as Exhibit 3.

29. Two types of printed advertisements were developed for in-store use. One, known as a "handout," was a single-page, double-sided flier, that sales associates would give to customers inside stores. Handouts were tailored for each market. Each handout contained a series of different side-by-side comparisons of our products with similar products of competing retailers, including Ashley in applicable markets. Exhibit 1, the compilation of Ashley's deposition exhibits, contains copies of handouts between the pages Bates-labeled ASI 002459 and ASI 002473. An example of a handout ad from those pages attached to this declaration as Exhibit 4.

30. The other type of printed advertisement was a point-of-sale sign that was designed to be placed next to a floor display of an American Signature product. The point-of-sale displays were designed so that visual and printed material pertaining to the competitor's product could be inserted into the display, inviting consumers to compare our product with the competitor's product on appearance and, of course, price. Point-of-sale displays in the test phase of the ad campaign were designed to be incorporated with inserts that were in fact pages printed out from

a competitor's Web site. A photograph showing this type of comparative advertisement is contained in Exhibit 12 of the proposed amended complaint Ashley filed in its lawsuit in the Northern District of Illinois, a copy of which is attached to this declaration as Exhibit 5. This particular photograph shows a version of the point-of-sale display that was used in an early test phase of the campaign, in which the competitor's product was identified by affixing a printout from the competitor's Web site to the point-of-sale display. Later point-of-sale displays used as inserts side-by-side depictions of our product and the competitor's product, listing the respective prices.

31. Prices were reported on the ads along with an "as of" date, which was the date on which the respective prices of our product and the competitor's product were confirmed by our personnel. The "as of" dates were intended to represent to the consumer the exact date on which the price comparison was made.

32. Many retail companies, including Ashley, advertise their products using higher comparison prices of a purported competitor for a similar product, but it is rare that they inform customers of the actual dates on which the comparisons were made. In my experience, Ashley neither reports the identity of the competing seller or the dates of the "compare" prices it states in its advertising. Thus, the consumer is given no way to determine whether the comparison price is a relatively recent one or, on the other hand, an old price that is likely no longer valid. By providing the dates on which the prices were last confirmed, we allowed customers to draw their own conclusions about how recent the price comparisons were and make their own judgment about whether to rely on the quoted prices.

33. None of our comparative advertisements made any representations about product quality. I am aware that in this litigation, Ashley has claimed that the comparative ads made

"suggestions" about relative quality of our products compared with its products. In designing the campaign and the advertisements themselves, however, American Signature made no statements or suggestions about "quality" or product construction, and it had no intention of doing so.

34. Ultimately, the purpose of the comparative advertising campaign was to let customers decide what they like best for their money. In my experience, customers will decide whether they like the look of one furniture product better than another, which one is more comfortable to sit in or lie in, which fits their space better, and how much they're willing to pay. Each customer also will determine what "value" and "quality" means to him or her.

35. While Ashley finds fault with American Signature's advertisements in this litigation and appears to claim that the advertisements are misleading or do not provide enough information, Ashley's own advertising is sorely lacking on those very points.

36. For example, Exhibit 14 to this declaration contains a sampling of Ashley advertisements that were produced in discovery by The Columbus Dispatch in response to a subpoena served by American Signature (Ashley received copies of these advertisements from American Signature's counsel). As is seen in these Columbus Dispatch ads, which are typical of Ashley's advertising in general, the usual Ashley technique is to show an image of a furniture item, state the price, and then invite the consumer to "compare at" a higher price. At the bottom of the Ashley ads, in print so tiny that some people would need a magnifying glass to read it, Ashley states that the "compare" price is the "regular" or "original" price for the same item or a "comparable" item offered for sale at another retailer. The Ashley advertisements do not identify the other retailer that supposedly sells the "comparable" furniture item. They also do not identify or name the specific item from another retailer that the consumer is asked to "compare." The advertisements do not depict the competing product. The advertisements also do not state

when the "compare" price was checked. Thus, unlike the American Signature's advertisements that are the subject of this litigation, Ashley's omission of the competitor's retailer's name and identity of the item compared prevents consumers from checking the "comparable" item for themselves and deciding which item they prefer in terms of price or any other feature. The omission of any information about when the price was checked also precludes consumers from making any judgment about the possible reliability of the "compare" price.

  I declare under penalty of perjury that the foregoing is true and correct. Executed on June 8, 2012.

_____
Scott Binger

885-005:369359